**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**Marcia Jayne Burstall,,**

             **Plaintiff,**         **Civil Action No. 11-12215**

       **vs.**             **District Judge Arthur J. Tarnow**

**Michael J. Astrue,**        **Magistrate Judge Mona K. Majzoub**
**Commissioner of**
**Social Security,**

          **Defendant.**
_____/

**Report and Recommendation**

Before the Court are Plaintiff Marcia Jayne Burstall and Defendant the Commissioner of Social Security's motions for summary judgment on Plaintiff's request for judicial review of the denial of her Social Security disability and supplemental income benefits. (Dkt. 9, 11.) The Court has been referred these motions for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (Dkt. 3.) The Court has reviewed the pleadings, dispenses with a hearing, and issues this report and recommendation.[1]

**I.**      **Recommendation**

Because the Court recommends finding that substantial evidence supports the ALJ's RFC, and that Plaintiff's other arguments are unavailing, the Court recommends denying Plaintiff's motion for summary judgment, granting Defendant's motion for summary judgment, and dismissing this case.

---

[1]The Court dispenses with a hearing pursuant to Eastern District of Michigan Local Rule 7.1(f)(2).

1

II.     **Report**

A.     **Facts**

1.     **Procedural facts**

On November 7, 2006 Plaintiff filed a Title II application for disability and disability insurance benefits.  (AR at 13.)  Plaintiff alleged disability beginning on October 31, 2006.  (*Id.*) The claim was initially denied and Plaintiff requested review of that denial.  (*Id.*)  On May 13, 2009 the ALJ held a hearing on Plaintiff's request.  (*Id.*)  On May 29, 2009 the ALJ issued a written decision denying Plaintiff her benefits request.  (*Id.* at 10.)  Plaintiff requested review by the Appeals Council.  On March 22, 2011 the Appeals Council denied Plaintiff's request for review of the ALJ's decision.  (*Id*. at 1.)  On May 20, 2011 Plaintiff sought judicial review by filing this suit.  (Dkt. 1.)

2.     **The ALJ's written decision**

On May 29, 2011 the ALJ issued his written decision denying Plaintiff her benefits request. (AR at 10.)  The ALJ found that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine and bipolar disorder.[2]  (*Id*. at 15.)  The ALJ then stated that Plaintiff did not have an impairment that met or medically equaled a listed impairment.  (*Id.*)

As to Plaintiff's bipolar disorder, the ALJ stated that he analyzed the record evidence under Listing 12.04 (Affective Disorders).  (AR at 16.)  The ALJ stated that Plaintiff's mental impairment did not meet or medically equal the criteria for Listing 12.04.  (*Id.*)  The ALJ then analyzed the evidence under the Paragraph B criteria.[3]

---

[2]As Defendant points out, Plaintiff only challenges the bipolar disorder analysis.  The Court therefore will discuss the record in light of that singular challenge.

[3]These factors are the factors that 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00 Mental Disorders requires Defendant to analyze when determining whether a claimant's mental disorder

2

The ALJ reviewed Plaintiff's disability report.  (AR at 16.)  In that report, the ALJ noted that

Plaintiff alleged that she had bipolar disorder.  (*Id.*)  As a result of that disorder, the ALJ reviewed,

Plaintiff stated that she felt fatigued, experienced racing thoughts, and could not sit still.  (*Id.*)  The

ALJ also noted that Plaintiff stated how it was hard for her to get going in the morning and that she

could take up to two hours to get ready.  (*Id.*)  The ALJ also noted that an adult third party function

report showed that Plaintiff enjoyed being around other people, yearned to be around others, visited

with friends and family, and attended church regularly.  (*Id.*)  But the ALJ stated that the third party

also reported that Plaintiff could be withdrawn at times and that he believed that Plaintiff's bipolar

disorder affected Plaintiff's ability to complete tasks, her concentration, and her mental

effectiveness.  (*Id.*)  The ALJ stated that, at the hearing, Plaintiff indicated that her bipolar disorder

caused her memory problems, made her be withdrawn, and resulted in her becoming stressed out

easily and becoming anxious.  (*Id.*)  The ALJ also stated that Plaintiff indicated that she generally

got along with other people and that she would talk on the phone every day.  (*Id.*)  The ALJ also

---

is severe and limits the claimant's ability to perform substantial gainful activity.  Paragraph B
requires Defendant to assess the claimant's functional limitation using four criteria: activities of
daily living; social functioning; concentration, persistence or pace; and episodes of
decompensation.  *Id.*  For Section 12.04 affective disorders, the requisite severity is met when
the claimant shows that he has two of the following: 1. Marked restriction of activities of daily
living; or 2. Marked difficulties in maintaining social functioning; or 3.  Marked difficulties in
maintaining concentration, persistence, or pace; or 4.  Repeated episodes of decompensation,
each of extended duration.  *Id.* at 12.04(B).  A plaintiff can also meet the 12.04 listing by
establishing the 12.04 Paragraph C criteria: "Medically documented history of a chronic
affective disorder or at least 2 years' duration that has caused more than a minimal limitation of
ability to do basic work activities, with symptoms or signs currently attenuated by medication or
psychosocial support, and one of the following: 1.  Repeated episodes of decompensation, each
of extended duration; or 2.  A residual disease process that has resulted in such marginal
adjustment that even a minimal increase in mental demands or change in the environment would
be predicted to cause the individual to decompensate; or 3.  Current history of 1 or more years'
inability to function outside a highly supportive living arrangement, with an indication of
continued need for such an arrangement."  *Id.* at 12.04(C).

noted that Plaintiff testified that she had difficulty concentrating and completing tasks. (*Id.*)

      The ALJ then reviewed the medical evidence. (AR at 16.) He stated that, after conducting that review, he found that Plaintiff's allegations "were only partially corroborated." (*Id.*) He noted that treatment notes existed from Saint Joseph Mercy Behavioral Services, dated from 1998 to 2003–records which "predated [Plaintiff's] alleged onset of disability." (*Id.*) The ALJ noted that the treatment notes were "generally unremarkable." (*Id.*) He found that Plaintiff sought counseling for several problems related to friends and family members. (*Id.*) He further found that the treatment notes stated that Plaintiff was "stable" and "doing well." (*Id.* at 17.)

      The ALJ noted that Plaintiff was hospitalized on February 10, 2001 at Saint Joseph Mercy Hospital. (AR at 17.) The ALJ recounted that the records showed that Plaintiff was admitted with paranoia and "ideas of reference psychosis." (*Id.*) The hospital diagnosed Plaintiff with schizoaffective disorder and noted that Plaintiff had "psychotic like experiences when she [was] under stress." (*Id.*) The hospital diagnosed Plaintiff, the ALJ stated, with a GAF of 15 at the time of admission. (*Id.*) The ALJ noted that the hospital indicated that Plaintiff showed improvement during her stay. (*Id.*) The ALJ stated that the hospital released Plaintiff on February 15, 2001. (*Id.*) The ALJ then noted that Plaintiff was hospitalized again three years later, on November 6, 2004. (*Id.*) During that hospitalization, the ALJ noted that Plaintiff was diagnosed with bipolar disorder rather than schizoaffective disorder. (*Id.*) The ALJ noted that the records showed that Plaintiff's bipolar disorder resulted in "relatively severe psychotic episodes," and that Plaintiff had a "delusion that other people in her environment were imposters." (*Id.*) The ALJ stated that the records showed that this delusion was a result of Plaintiff suffering an adverse reaction to a change in her medication. (*Id.*) The ALJ noted that, at the 2004 admission, Plaintiff's GAF was 35. (*Id.*) The

ALJ then noted that records indicated that Plaintiff's condition improved, her medication was altered, and she was released on the same day.  (*Id.*)  The ALJ reviewed Plaintiff's next hospital admission, on January 29, 2006.  (*Id.*)  The ALJ stated that the records showed that Plaintiff was admitted because she "entered a manic state or some form of psychotic state that was characterized by a disrupted sleep, racing thought, thought blocking, hallucinations, and delusions."  (*Id.*)  At her admission, the ALJ noted that Plaintiff's GAF was 20.  (*Id.*)  The ALJ noted that records showed that Plaintiff was discharged on Feburary 24, 2006 after her condition was noted at "stable."  (*Id.*)  The ALJ then stated that Plaintiff was admitted to the hospital a fourth time, near October, 2006, because Plaintiff had a lot of stress due to her upcoming marriage.  (*Id.*)  The ALJ noted that Plaintiff was released two days after her admission.  (*Id.*)

The ALJ summarized that Plaintiff's four separate psychiatric hospitalizations "all predated [Plaintiff's] alleged onset date of disability.  (AR at 17.)  The ALJ further noted that "the only hospitalization that would be over two weeks in duration [] was the hospitalization in January of 2006."  (*Id.*)

The ALJ then reviewed the records that occurred after the onset of Plaintiff's alleged disability.  (AR at 17.)  He stated that the post-onset records showed that Plaintiff's bipolar disorder had shown improvement since her hospitalizations.  (*Id.*)  The ALJ stated that Plaintiff's treatment notes from the Fulton County Health Center, dated from late 2007 until early 2009 "were consistently unremarkable as [Plaintiff] was consistently noted as being alert and oriented in all spheres; [] was cooperative and made good eye contact; her speech was coherent, goal oriented and not pressured; and her affect and mood appeared to be appropriate."  (*Id.*)  The ALJ noted that Plaintiff's progress notes from September 29, 2008 indicated that Plaintiff was working as a

receptionist.  (*Id.*)  The ALJ noted that Plaintiff reported experiencing some anxiety, but that Plaintiff could alleviate the anxiety with deep breathing and relaxation techniques. (*Id.*)  The ALJ noted that Plaintiff's concentration was reported as "being good."  (*Id.*)  The ALJ noted that a February 17, 2009 report indicated that Plaintiff had lost her job for "having difficulties prioritizing, not keeping records correctly, and not scheduling correctly." (*Id.*)  The ALJ stated that Plaintiff "denied any side effects of her medication, her sleep was described as pretty good, and her appetite was described as average." (*Id.*)  The ALJ further stated that Plaintiff's GAF was assessed "frequently" during her treatment at Fulton County and ranged from 50 to 65.  (*Id.* at 17-18.)  The ALJ reasoned that Plaintiff's "improved GAF scores demonstrated that [her] condition had improved substantially since her previous hospitalizations."  (*Id.* at 18.)

The ALJ reviewed Plaintiff's treatment notes from the Fulton County Health Stress Unit. (AR at 18.)  He reviewed that Plaintiff quit school when she was a junior in college, due to her inability to handle the stress of working and attending college full time.  (*Id.*)  He also reviewed that Plaintiff's appetite was good and that she had gained over sixty pounds in the past twelve years. (*Id.*) He further reviewed records that showed that Plaintiff's energy level was described as "okay," but that her concentration was described as "not very good."  (*Id.*)  The ALJ stated that Plaintiff denied feelings of worthlessness, decreased pleasure, crying spells, and suicidal or homicidal ideation.  (*Id.*) The ALJ noted that Plaintiff had stated that her work was somewhat stressful because it "was just too busy."  (*Id.*)  The ALJ noted that Plaintiff stated that she planned to quit her work.  (*Id.*) The ALJ also noted that Plaintiff denied any current hallucinations and said that she only had hallucinations or psychotic symptoms when she had a manic episode.  (*Id.*)

The ALJ then reviewed an August 21, 2007 note from Dr. Mangen.  (AR at 18.)  The ALJ

6

stated that Dr. Mangen noted that Plaintiff had been a counselor for a church camp for seventh and eighth graders and that she had stated that she enjoyed the experience. (*Id.*)  Dr. Mangen also noted that Plaintiff had quit her job the previous week.  (*Id.*)  Dr. Mangen, the ALJ stated, wrote that Plaintiff had been working in a pharmacy and found that the job was too stressful and therefore transferred to the cosmetics counter.  (*Id.*)  Then the ALJ noted that Plaintiff quit her job because the pay was a lot lower and she did not think that the job was worth the drive there and back for the amount of money she received.  (*Id.*)  The ALJ noted that the records also showed that Plaintiff had difficulty with one of the managers and that she felt as if she had to drag herself to work.  (*Id.*)  The ALJ stated that Dr. Mangen noted that Plaintiff desired another job, but wanted a job that was not very stressful and from which she could receive some enjoyment.  (*Id.*)  The ALJ noted that Dr. Mangen found that Plaintiff was alert and oriented, cooperative and maintained good eye contact; had an appropriate affect and euthymic mood; had coherent speech, was goal directed; had no pressured speech; and had no flight of ideas or circumstantiality.  (*Id.*)  The ALJ stated that Dr. Mangen noted that Plaintiff had been taking her medication as directed and experienced no side effects–Plaintiff was sleeping well, had a fine appetite, a minimal decrease in energy, and a less than desirous level of concentration.  (*Id.*)

The ALJ reviewed a State Disability Determination Services' consultative examination performed by Harold Stephen Bilotta, Jr., and James P. Steyard.  (AR at 18-19.)  The ALJ noted that the findings were generally unremarkable.  (*Id.*)  The ALJ stated that the examination concluded that Plaintiff had ability to learn simple tasks and could independently perform daily activities.  (*Id.*)

The ALJ then discussed the Paragraph B criteria in relation to Plaintiff's mental impairment. (AR at 19.)  The ALJ first stated that he gave little weight to Plaintiff's testimony because the

7

testimony was "not fully corroborated by the medical evidence of record." (*Id.*) The ALJ pointed out that Plaintiff testified that she was unable to hold a job because of her psychological condition. (*Id.*) But the ALJ countered that Plaintiff actually left her longest serving job because the job's location moved and that Plaintiff worked as a pharmacy technician but transferred because she felt that that job was too stressful. (*Id.*) And the ALJ pointed out that she left the cosmetic counter job that she transferred to because she felt as if the pay was too low. (*Id.*) The ALJ noted Plaintiff's hospitalizations, but stated that Plaintiff had only one hospitalization that was longer than two weeks, and even that admission fell outside of the alleged onset of disability. (*Id.*) The ALJ found that Plaintiff's condition had "markedly improved" since the "last major change in [Plaintiff's] medications, and noted that Plaintiff had not been hospitalized since. (*Id.*) The ALJ found that the medical evidence supported DDS's determination and concluded that Plaintiff had "mild restrictions in the activities of daily living, mild difficulty maintaining social function, and moderate difficultly maintaining concentration, persistence, or pace." (*Id.*)

The ALJ stated that, because Plaintiff's mental impairment did not cause at least two "marked" limitations or a "marked" limitation and "repeated" episodes of decompensation, Plaintiff's impairment did not meet the Paragraph B criteria. (AR at 20.)

The ALJ then calculated Plaintiff's RFC. (AR at 20.) Regarding her mental RFC, the ALJ stated that "[d]ue to [her] mental impairment, [she] is only able to perform unskilled work." (*Id.*)

The ALJ reviewed the vocational expert's testimony, in which the expert stated that jobs existed in the economy that Plaintiff could perform, and then directed a finding of not disabled. (AR at 25.)

### 3.    The May 13, 2009 hearing

8

On May 13, 2009 Plaintiff testified at her hearing.  (AR at 27.)  The ALJ asked Plaintiff about her normal day.  (*Id*. at 42.)  She answered that she usually got up, drank coffee, and that she took her time to wake up.  (*Id.*)  She stated that she also took her medication around breakfast, which was usually at 10:00 a.m.  (*Id.* at 43.)  After breakfast, she stated that she either called her friends, mom, or husband, or read some devotions.  (*Id.*)  She added that she did not read often, because she could not usually remember what she read, so she stated that she usually just quit reading and got ready for the day.  (*Id.* at 44.)  She then stated that her next activity was sometimes lunch, between 12:30 and 1:00 p.m.  (*Id.* at 44.)  After lunch, she stated that she rested for an hour or more.  (*Id.*)  After resting, she stated that she watched television or sometimes did household chores.  (*Id.*)  She stated that she also cooked dinner.  (*Id.*)  After dinner, she stated that she sometimes went to a prayer group, or would stay home with her family and watch television.  (*Id.* at 45.)  She added that sometimes she would go up to her room, shut the door, and isolate herself.  (*Id.*)

The ALJ then questioned Plaintiff about her psychological impairments that prevented her from working.  (AR at 47.)  She answered she could not remember anything.  (AR at 47.) She also stated that she became stressed very easily.  (*Id.*)  And she added that she became anxious and withdrawn from her coworkers.  (*Id.*)  She stated that she sometimes would not go into work because she was afraid of what was going to happen in her day.  (*Id.*)

She also stated that she was receiving treatment for her psychological condition, at Fulton County Health Center in Ohio.  (AR at 48.)  Plaintiff added that she saw both a psychiatrist and a psychologist, with varying frequency.  (*Id.* at 49.)

Plaintiff stated that she felt that the mental health treatment was helping her.  (AR at 51.)

The ALJ asked Plaintiff to give an example of when her alleged failure to concentration

caused her a problem.  (AR at 52.)  Plaintiff answered,

> I get very anxious because I can't do everything that is needed to be done and I can't concentrate and people are talking and I can't concentrate when I'm reading anything at home, if the TV's on or if people are talking or if there's commotion going on around me or that kind of thing.

(AR at 53.)

The ALJ then asked the vocational expert whether jobs existed in the economy for someone who could perform unskilled work.  (AR at 63.)  The vocational expert testified that there were a number of jobs.  (*Id*. at 63-64.)

### 4.      Record evidence[4]

In November, 2006 Plaintiff had a disability report conducted.  The report shows that the interviewer found that Plaintiff had no problems understanding, being coherent, or concentrating.  (AR at 140.)  The interviewer also found that Plaintiff was very friendly and cooperative.  (*Id.*)

On the report, Plaintiff indicated that she had a racing mind, that she could not sit still, and that she had depressed or manic feelings.  (AR at 141.)   She also explained activities that could occur in her daily routine: wake up, have coffee, call her mom, watch the news, shower, take medication, eat lunch, nap, talk to a friend or neighbor, have dinner, watch television, in bed around 9:30 p.m.  (*Id*. at 161.)  Plaintiff stated that she prepared her own meals daily and that she was able to do housework.  (*Id*. at 163.)  Plaintiff also stated that she was able to get around everyday, unless she was feeling "blue."  (*Id.* at 164.)  Plaintiff got around by walking, driving, and riding in a car.  (*Id.*)  She also shopped on her own.  (*Id.*)  She indicated that she had some difficulty with her

---

[4]The Court has reviewed the medical evidence that occurred before Plaintiff's alleged onset date and finds that the ALJ presented an accurate portrait of those events.  The Court therefore does not discuss that evidence in detail, here.

money–paying bills, handling a savings account, and using a checkbook/money order.  (*Id.*)

As to activities, Plaintiff indicated that she watched television, knitted, and walked, although, since her bipolar disorder, she did less knitting and walking.  (AR at 165.)  She did indicate that she saw other people on a regular basis.  (*Id.*)

She indicated that she had problems with her memory, completing tasks, concentration, understanding, and following instructions.  (AR at 166.)

A third party disability report filled out by her brother generally echoes Plaintiff's own statements and concerns about her limitations.  (AR at 171-79.)

On February 13, 2007 Masterpeace Center for Counseling & Development filled out a psychological report for the Michigan Disability Determination Service.  (AR at 292.)  The report noted that Plaintiff stated she was first diagnosed with bipolar disorder in 1996.  (*Id.*)  The report also shows that Plaintiff got along well with family and friends but did not have contact with her coworkers.  (*Id.* at 293.)  The report shows that the interviewer found Plaintiff cooperative throughout the interview.  (*Id.* at 294.)  During the examination, Plaintiff stated that she used to enjoy her activities (exercise, knitting, and cooking) but no longer had the ambition to do those activities.  (*Id.*)  During the interview, she also stated that she had memory issues–when she read, she could not remember anything.  (*Id.* at 295.) But then she stated that her memory actually varied. (*Id.*)  The examiner noted that "[Plaintiff] provided information for this assessment from memory." (*Id.*)  The examiner evaluated Plaintiff's memory.  (*Id.* at 296.)  The examiner stated that, testing Plaintiff's immediate memory, Plaintiff could repeat six numbers forward and three numbers backward.  (*Id.*) The examiner also noted that Plaintiff could recall three objects after three minutes. (*Id.*)  Plaintiff further could remember her date of birth and a past president.  (*Id.*)  The examiner

11

gave a "[g]uarded" prognosis for Plaintiff and stated that Plaintiff may benefit from mental health counseling. (*Id*. at 297.) The examiner also formed the impression that Plaintiff did have the capacity to manage her own funds. (*Id.*)

On February 21, 2007 Dr. Weicher vanHouten, M.D., conducted an psychiatric review of Plaintiff. (AR at 301.) He noted that Plaintiff did have bipolar syndrome. (*Id*. at 304.) In assessing her mental residual functional capacity, Dr. vanHouten noted that Plaintiff was "[n]ot [s]ignificantly [l]imited" in the following areas: the ability to remember locations and work-like procedures; the ability to understand and remember very short and simple instructions; the ability to carry out very short and simple instructions; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; the ability to travel in unfamiliar places or use public transportation; and the ability to set realistic goals or make plans independently of others. (*Id*. at 315-16.) Dr. vanHouten noted that Plaintiff was "[m]oderately [l]imited" in the following areas: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; and the ability to maintain attention and concentration for extended periods. (*Id*.) Dr. vanHouten summarized that Plaintiff was "able to remember, understand, [and] follow easy directions and learn simple tasks." (*Id.* at 317.) He also stated that Plaintiff could "independently perform daily activities." (*Id.*)

In the summer of 2007, Plaintiff started going to Fulton County Health Center for mental health treatment. (AR at 395.) In her initial report, Plaintiff stated that "work [wa]s very stressful

because it [wa]s just too busy and she [wa]s planning on quitting." (*Id.*)  The initial report also noted that Plaintiff's concentration was "not very good."  (*Id.*)  The initial report also indicated that Plaintiff "did have some deficits in attention, concentration, and memory." (*Id.* at 396.)  The report shows that Plaintiff was "only able to recall two out of three objects after five minutes and was only able to perform three out of five serial sevens." (*Id.*)

An August 21, 2007 Fulton County Health Center progress note shows that Plaintiff had recently moved from her pharmacy job to the cosmetics counter, but that she quit the cosmetics counter job because she felt that the pay was a lot lower and she felt as if the pay was not worth the effort to drive there back and forth.  (AR at 392.)

Throughout Plaintiff's treatment at Fulton County, notes indicate that her concentration ranged from "pretty good" to "okay" to "good."  (AR at 387, 379, 375, 371.)

On December 22, 2008 a progress note indicates that Plaintiff had problems with concentration.  (AR at 368.)

The last progress note in the record, dated February 16, 2009:

> Marcia said that she lost her job.  They told her they did not like what she was doing but she thought she was doing a good job.  They told her she had difficulty prioritizing, was not keeping the records correctly, was not scheduling correctly.  She was very upset and disappointed when this happened.  She said that she is having difficulty keeping jobs.  She can only keep them for about three or four months.  She has had three different jobs in the past year and she is not sure what kind of job she would be able to be good at.  She denies any side effects.  She is sleeping pretty good, appetite is average, energy level is down, and she said she will take naps during the day because there is nothing else to do.  Concentration is not very good. She is having difficulty focusing on one thing.  She denies any suicidal thoughts but was feeling really down when she lost her job.

(AR at 365.)

**B.    Standards**

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review under this statute is limited to determining whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner's decision employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases, resolve conflicts in the evidence or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.3d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the Court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

### 1.	Framework for social security disability determinations

Plaintiff's Social Security disability determination was made in accordance with a five step

14

sequential analysis.  In the first four steps, Plaintiff was required to show that:

1.  he was not presently engaged in substantial gainful employment; and
2.  he suffered from a severe impairment; and
3.  the impairment met or was medically equal to a "listed impairment;" or
4.  he did not have the residual functional capacity to perform his relevant past work.

*See* 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f).  If Plaintiff's impairments prevented her from doing her past work, the Commissioner, at step five, would consider her residual functional capacity ("RFC"), age, education and past work experience to determine if she could perform other work. If she could not, she would be deemed disabled.  *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).  The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform."  *Her*, 203 F.3d at 391.  To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs."  *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987) (citation omitted).  This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'"  *Id.* (citations omitted).

### C.    Analysis

Plaintiff argues that substantial evidence did not support the ALJ's evaluation and RFC of Plaintiff's mental impairment.  (Pl.'s Mot. for Summ. J. at 9.)  She argues therefore that the vocational expert testimony elicited by the hypothetical question that the ALJ posed to the vocational expert is not substantial evidence upon which the ALJ could properly base his denial of Plaintiff's benefits request.  (*Id.* at 9-10.)

Plaintiff specifically argues that the ALJ "erred in doubting her credibility, ignoring the

evidence of her unsuccessful work attempts, and surmising from the medical evidence conclusions not supported by the records." (*Id*. at 10.)

Defendant argues that the "ALJ's RFC finding that Plaintiff could perform unskilled work is supported by substantial evidence, including physician opinions, clinical findings, and Plaintiff's treatment history[.]" (Def.'s Mot. for Summ. J. at 8.)

Here, the issue boils down to whether substantial evidence supports the decision that Plaintiff's mental impairments are accurately captured in an unskilled work RFC.[5] The Court finds that substantial evidence does exist that Plaintiff could perform unskilled work. Again, the issue is not whether *all* of the evidence supports the ALJ's decision, but whether "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" exists. Here, the Court finds that such evidence exists that a reasonable mind might accept the ALJs decision.

Plaintiff first states that the ALJ found that Plaintiff's bipolar condition caused her to suffer moderate difficulties in maintaining concentration, persistence, or pace. (Pl.'s Mot. for Summ. J. at 10.) Plaintiff argues that the ALJ failed to include a that moderate limitation in his RFC and that that failure "alone is sufficient to render the hypothetical question . . . presented to the [vocational expert]" as "insufficient and erroneous." (*Id*.)

The Court disagrees with Plaintiff. The Court finds that substantial evidence supports the ALJ's RFC determination and hypothetical to the vocational expert and that the hypothetical is

---

[5]Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, we consider jobs unskilled if the primary work duties are handling, feeding and off bearing . . . or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs. 20 C.F.R. § 404.1568(a).

legally sufficient.

While Plaintiff does point to cases from this circuit and district that appear to support her argument that an ALJ must craft a hypothetical question that factors in moderate limitations in concentration, persistence, or pace, courts in this district have also held that even when an ALJ does not explicitly address moderate limitations in concentration, persistence, or pace remand is not necessary when substantial evidence supports the hypothetical question.

For example, in *Lewicki v. Commissioner of Social Security*, 09-11844, 2010 WL 3905375, at *3 (E.D.Mich. Sept. 30, 2010) (Ludington, J.), the court, citing the report and recommendation, held that "[d]ecisions in this district reflect the conclusion that a moderate impairment in concentration, persistence, and pace does not necessarily preclude simple, routine, unskilled work." (citations omitted). That court also stated, "[t]here may be cases where such moderate limitations preclude the performance of even some simple, unskilled tasks. [The plaintiff] does not, however, explain why the facts of this particular case require a more detailed hypothetical question to adequately account for his own moderate limitations in concentration, persistence, or pace." *Id*. The ultimate question, therefore, is whether the ALJ's decision was supported by substantial evidence. *Id*. *See also Schalk v. Comm'r*, 10-13894, 2011 WL 4406824, at *11, n 6, 7 (E.D.Mich. Aug. 30, 2011) (Michelson, Mag. J.) *adopted by* 2011 WL 4406332 (E.D.Mich. Sept. 22, 2011)) (discussing how "there is no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of 'unskilled work' but excludes a moderate limitation in concentration. Rather, [the court] must look at the record as a whole and determine if substantial evidence supports the ALJ's RFC."). *See also Roberts v. Comm'r*, 2011 WL 4407221 (Michelson, Mag. J.) (E.D.Mich. Aug. 8, 2011) *adopted by* 2011 WL 4406344 (E.D. Mich. Sept. 22, 2011) (noting that "[t]here are cases

17

ordering remand where an ALJ's hypothetical does not include a specific reference to moderate limitations in concentration or pace and only limits the hypothetical individual to unskilled work or simple, routine tasks–but also other cases that have found that an ALJ formed an accurate hypothetical by limiting the claimant to unskilled work and omitting a moderate concentration or pace limitation.").

The Court agrees with the cases above, for "a hypothetical question need not incorporate a listing of the claimant's medical conditions, [so long as] the vocational expert's testimony . . . take[s] into account the claimant's functional limitations, i.e., what he or she 'can and cannot do.'" *Infantado v. Astrue*, 263 F. App'x 469, 476 (6th Cir. 2008) (quoting *Webb v. Comm'r*, 368 F.3d 629, 632-33 (6th Cir. 2004)).

Here, the ALJ's hypothetical question limited Plaintiff to "unskilled work." The Court finds that the "unskilled work" limitation comports with Plaintiff's moderate limitations in concentration, persistence, or pace.[6]

Substantial evidence supports the ALJ's RFC and hypothetical question that Plaintiff could perform unskilled work without a specific concentration limitation.  On the November, 2006 disability report, the interviewer reported that Plaintiff had no problems understanding, being coherent, or concentrating.  (AR at 140.)  In 2007 Masterpeace Center for Counseling &

---

[6]"Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." "On mental status examinations, concentration is assessed by tasks such as having you subtract serial sevens or serial threes from 100. In psychological tests of intelligence or memory, concentration is assessed through tasks requiring short-term memory or through tasks that must be completed with established time limits."  20 C.F.R. pt. 404, subpt. P, app. 1, § 12(c)(3).

Development records showed that Plaintiff stated that she had memory issues; but the interviewer noting that Plaintiff provided all of the information from memory and that Plaintiff could repeat six numbers forward and three backward, could recall three objects after three minutes, and could remember her date of birth as well as a past president.  (*Id*. at 295-96.)  Also in 2007 Dr. vanHouten noted that Plaintiff was not significantly limited in many areas, including the ability to understand and remember and carry out very short and simple instructions.  (*Id*. at 315-16.)  Dr. vanHouten also found that Plaintiff was not severely limited in being able to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (*Id*.)  Dr. vanHouten only found that Plaintiff was moderately limited in the ability to understand, remember, and carry out detailed instructions and the ability to maintain attention and concentration for extended periods.  (*Id*.)  The Fulton County Health Center records also are substantial evidence that supports the ALJ's RFC.  These records vary.  The records show that, upon first receiving treatment at the center, Plaintiff's concentration was 'not very good" and that Plaintiff "did have some deficits in attention, concentration, and memory."  (*Id*. at 395.)  The initial report also shows that Plaintiff was only able to recall "two out of three objects after five minutes and was only able to perform three out of five serial sevens."  (*Id*. at 396.)  But later Fulton County reports show that Plaintiff's concentration ranged from "pretty good" to "okay" to "good."  The Fulton County reports also show that, in August, 2007, Plaintiff quit a cosmetics counter job simply because she felt the pay was not worth it.  (*Id*. at 392.)  The last two progress notes do indicate that Plaintiff's concentration was not very good.  (*Id*. at 368, 365.)

Given Dr. vanHouten's assessment and the varying records from Fulton County, the Court

19

recommends finding that substantial evidence does support the ALJ's decision that Plaintiff could perform unskilled work.   While the Fulton County did report that Plaintiff had problems concentration at varying times, the majority of the treatment records show that her concentration levels were "okay" to "good."   The Court recommends finding that these records are substantial evidence on which to uphold the ALJ's denial.

Plaintiff next argues that the ALJ "improperly minimized the significance of her 9 hospitalizations for the condition[.]" (Pl.'s Mot. for Summ. J. at 10.)   The Court disagrees.   "While evidence concerning ailments outside the relevant time period can support or elucidate the severity of a condition, it cannot serve as the only support for a claim of disability."   *Routh v. Astrue*, 698 F.Supp.2d 1072, 1075) (E.D. Ark.) (citing *Pyland v. Apfel*, 149 F.3d 873, 876-78 (8th Cir. 1998)). *See also Selk v. Barnhar*, 234 F.Supp.2d 1006, 1014 (S.D.Iowa) (citing *Pyland*, 149 F.3d at 878) (stating, "evidence outside the relevant time period cannot serve as the only support for the disability claim.").   Here, the ALJ thoroughly reviewed the hospitalizations and even discussed the hospitalizations when evaluating Listing 12.04.   The ALJ was correct to point out that the hospitalizations fell outside of the disability period but he weighed them and addressed them in his opinion.   The ALJ did not err.

Plaintiff also argues that the ALJ improperly addressed Plaintiff's credibility.   (Pl.'s Mot. for Summ. J. at 14-15.)   Given that an ALJ is in the "best position to observe witnesses' demeanor and to make an appropriate evaluation as to their credibility," "an ALJ's credibility assessment will not be disturbed 'absent compelling reason.'" *Reynolds*, 424 F.App'x at 416-17 (citations omitted). The Sixth Circuit has instructed,

[i]n making a credibility determination, Social Security Ruling 96-7p provides that

20

the ALJ must consider the record as a whole, including objective medical evidence; the claimant's statements about symptoms; any statements or other information provided by treating or examining physicians and other persons about the conditions and how they affect the claimant; and any other relevant evidence.

*Id*. (citing SSR 96-7p, 1006 WL 374186, at *2 (July 2, 1996)). Here, the ALJ did not err, again. He thoroughly reviewed the evidence. He found that substantial evidence existed that Plaintiff was not severely limited by concentration problems. He discussed Plaintiff's past work attempts. He found illuminating the fact that Plaintiff quit her cosmetic counter job because she felt as if it did not pay enough. The Court therefore recommends finding that a compelling reason does not exist to set aside the ALJ's credibility finding.

Plaintiff also argues that the ALJ failed to address 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(E), which states,

Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication. For instance, if you have chronic organic, psychotic, and affective disorders, you may commonly have your life structured in such a way as to minimize your stress and reduce your symptoms and signs. In such a case, you may be much more impaired for work than your symptoms and signs would indicate. The results of a single examination may not adequately describe your sustained ability to function. It is, therefore, vital that we review all pertinent information relative to your condition, especially at times of increased stress. We will attempt to obtain adequate descriptive information from all sources that have treated you in the time period relevant to the determination or decision.

Defendant argues that the ALJ did not err in specifically addressing this provision. (Def.'s Mot. for Summ. J. at 11.) Defendant points out Plaintiff's treating sources found that her mental condition improved and that no medical source recommended or prescribed a structured living arrangement. (*Id*.) Defendant also points out that Dr. vanHouten found that Plaintiff could independently perform her activities of daily living. (*Id*. at 11-12.) The Court agrees with

21

Defendant's argument. The Court adds that the ALJ did not rely upon a single examination. He looked at Plaintiff's treatment before her alleged date of disability and looked at all of Plaintiff's records. Of note, Plaintiff's records from Fulton County, as stated above, show a generally unremarkable level of impairment. The ALJ therefore appropriately considered all aspects of Plaintiff's life and all the appropriate records.

Plaintiff finally suggests that the ALJ erred because he did not address Plaintiff's failed work attempts. (Pl.'s Mot. for Summ. J. at 12.) Plaintiff argues that the ALJ did not properly consider 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(3). That section provides, in part,

> Information concerning your behavior during any attempt to work and the circumstances surrounding termination of your work effort are particularly useful in determining your ability or inability to function in a work setting.

Plaintiff argues that the ALJ did not address Plaintiff's 12-31-08 termination letter from Advance Urology & Continence Center. (Pl.'s Mot. for Summ. J. at 13.) This letter states that Plaintiff was terminated because she was not able to accomplish office duties assigned, had difficulty prioritizing tasks, had difficultly scheduling appointments, and did not keep accurate medical records. (*Id.*)

Defendant argues that any failure of the ALJ in not addressing this opinion is harmless, because the ALJ ultimately determined that Plaintiff could not perform any of her past work. (Def.'s Mot. for Summ. J. at 14.) Defendant also argues that Plaintiff "has not shown that the specific limitations listed in the employer's note would preclude Plaintiff from performing all work or otherwise undermine the ALJ's credibility finding." (*Id.*)

The Court agrees with Defendant. The ALJ specifically found that Plaintiff could not perform her past relevant work. Although the ALJ did not specifically address this termination, he did review Plaintiff's other work. As Defendant states, here, Plaintiff has not shown how the ALJ's

failure to address this termination letter undermined the ALJ's credibility determination or his ultimate RFC. The Court therefore recommends rejecting this argument.

### D.    Conclusion

Because the Court recommends finding that substantial evidence supports the ALJ's RFC, and that Plaintiff's other arguments are unavailing, the Court recommends denying Plaintiff's motion for summary judgment, granting Defendant's motion for summary judgment, and dismissing this case.

### III.    Notice to Parties Regarding Objections

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n Of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Any objections must be labeled as "Objection #1," "Objection #2," etc. Any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than ten days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address

each issue raised in the objections, in the same order and labeled as "Response to Objection #1,"

"Response to Objection #2," etc.

Dated:  July 18, 2012                    s/ Mona K. Majzoub_____
                                         MONA K. MAJZOUB
                                         UNITED STATES MAGISTRATE JUDGE


**PROOF OF SERVICE**

    I hereby certify that a copy of this Report and Recommendation was served upon Counsel

of Record on this date.

Dated: July 18, 2012                     s/ Lisa C. Bartlett_____
                                         Case Manager

24